IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CONTRACT DISPUTES ACT CONTRACT CLAIM

| | | |
|---|---|---|
| LAURELWOOD HOMES LLC | ) | |
| Plaintiff, | ) | No. 06-734C |
| v. | ) | (Chief Judge Damich) |
| THE UNITED STATES GOVERNMENT | ) | |
| Defendant | ) | |

FIRST AMENDED COMPLAINT

Plaintiff, by and through undersigned counsel, respectfully files this First Amended Complaint and alleges as follows:

This is a Contract Disputes Act claim appealing two final decisions of a contracting officer involving the twenty year lease of housing to the US Navy. The first final decision was dated October 3, 2006 and was the sole subject of the original complaint filed on October 26, 2006. Defendant has filed three motions for enlargement of time for filing its answer. Defendant has not yet filed an answer. On March 12, 2007, defendant transmitted a modified contracting officer's final decision that was in accordance with the primary relief sought by plaintiff. As such, this First Amended Complaint no longer seeks monetary damages, other than the proper calculation of interest, costs, attorneys' fees and other appropriate relief as deemed proper by the Court for the first contracting officer's final decision. The second contracting officer's final decision, dated November 30, 2006, involves the same contract and the same contracting

officer's denial of a semi-annual performance-based incentive fee earned by plaintiff in accordance with the terms of the contract.

## PARTIES

1. Plaintiff, Laurelwood Homes LLC ("Laurelwood" or "plaintiff") is a woman-owned small business and a Delaware limited liability company with a principal place of business at 323 West Comstock Street, Seattle, Washington 98119.

2. Defendant is the United States Government acting by and through the Department of the Navy, Naval Facilities Engineering Command, Atlantic, 6506 Hampton Boulevard, Norfolk, Virginia 23508-1278 (the "Navy" or "defendant").

## JURISDICTION

3. This Court has jurisdiction of this action under 41 U.S.C. 603 and 28 U.S.C. § 1491. This action is based on a written contract between the parties, Lease Number N62472-86-RP-00209 (the "Lease").

## FACTS

4. On or about October 24, 1988, the parties entered into what is known as Supplemental Agreement Number 3 to lease documents numbered N62472-86-RP-00209 for the lease of certain real property on Naval Weapons Station Earle that is used for housing authorized military personnel (the "Outlease").

5. On or about April 30, 1990, the parties executed Exhibit D to the Outlease for the lease, for a 20 year period, of improvements constructed by plaintiff on the real property (the "Inlease").

6. The improvements which are residential housing are located inside the guarded gates at Naval Weapons Station Earle and access is controlled completely and strictly by the Navy.

7. Article XVI A. of the Inlease states: "[t]his Agreement is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613) (the Act)."

8. Article IX of the Inlease states in its entirety:

> The Developer shall in any event and without prejudice to any other rights of the Government bear responsibility for loss or damage by fire; lightning; storm; tempest; explosion; impact; aircraft; riot; civil commotion; bursting or overflowing of water tanks, apparatus or pipes; flood; labor disturbances; earthquake; malicious damage (other than Government-caused) or any other casualty or act of God; and shall maintain at the expense of the Developer at all times during the term of this Inlease insurance coverage against the risks enumerated above with a reputable insurance company and shall ensure that the Government is named as a co-insured on any such policy. In no circumstances will the Developer be entitled to assign to any third party rights of action which Developer may have against the Government.

9. Part II E.2. of the Outlease states in its entirety:

> During any period covered by the Inlease, the Government shall also furnish, at no cost to the LESSEE, fire protection, police protection, snow removal on the roads, and refuse collection.

10. From the execution of the Lease through April 10, 2006, the Navy had consistently paid for vandalism occurring on the Laurelwood property generally consisting of destroyed vegetation, broken doors and windows, and internal damage to housing units.

11. On numerous recent occasions, the president of Laurelwood had written letters to the Navy, including the authorized contracting officer and the head of security on Naval Weapons Station Earle to express concern about the incidents of vandalism occurring at the Laurelwood property.

12. By invoice submissions of April 11, 2006, June 5, 2006, and July 28, 2006, Laurelwood submitted requests for payment of $13,659.50, plus interest, for vandalism caused by individual(s) on the Laurelwood property with the exclusive permission of the government.

13. By letter of August 22, 2006, Mr. Matthew D. Kurtz, Real Estate Contracting Officer notified Laurelwood that it would not pay for the vandalism damage.

14. On August 23, 2006, Laurelwood, through counsel, submitted a formal Contract Disputes Act claim to Mr. Kurtz in the amount of $13,659.50, plus interest.

15. By letter of September 5, 2006, Laurelwood notified Mr. Kurtz that it had been apprised that certain individuals had been apprehended by the security office at Naval Weapons Station Earl. Based on information and belief, those individuals are responsible for some of the vandalism at the Laurelwood property and that the Navy is currently obtaining payment from them for the damages caused.

16. By letter dated October 3, 2006, and received by counsel to Laurelwood on October 10, 2006, Ms. Frances M. Hoover, Real Estate Contracting Officer, issued a final decision on Laurelwood's claim and denied the claim in its entirety.

17. In the same letter dated October 3, 2006, Ms. Hoover stated:

> Based on the provisions of the leasing documents as set forth above, responsibility for damages resulting from vandalism rests with Laurelwood, and the Navy is not responsible for paying the invoices at issue. For the same reasons, past payments to Laurelwood for vandalism damages were made in error, and the Contracting Officer hereby determines that $39,060.89 is due and owing to the Navy for those erroneous payments.

18. By letter dated March 12, 2007, Ms. Hoover modified her final decision and revoked that part of her previous decision demanding $39,060.89 and notified Laurelwood of the payment of $14,072.61 for vandalism damages and interest.

19. Section G.4 of Exhibit C of the Inlease states:

> An incentive fee, for exceptional performance of standards contained in this Annex, not to exceed 5% of the "Maintenance Rental" for the preceding six month period, will be determined on a semi-annual basis by a board comprised of three Navy Officers or civilian personnel who will evaluate the Developers performance over the preceding six month period. The board will make a determination within 60 days after the end of the period to grant all, some or none of the award fee. The Incentive Fee will be determined using the following table and data provided by tenant questionnaires, Family Housing records, and Quality Assurance Evaluator records. The incentive will be prorated by the total number of points divided by the number of parameters rated, or 15, to form a percentage. That percentage would be multiplied by 5% of the "Maintenance Rental" to arrive at the final semi-annual incentive fee.

20. Based on information an belief, the Navy has never collected data from tenant questionnaires.

21. By letter dated September 28, 2006, the contracting officer notified Laurelwood that she was denying all of the incentive fee for the period of November 1, 2005 through April 30, 2006.

22. By letter dated October 2, 2006, Laurelwood filed a formal claim with the contracting officer of the denial of the Incentive Fee.

23. By letter dated November 30, 2006, the contracting officer denied the majority of Laurelwood's claim by awarding only twenty percent of the earned amount.

24. Twenty percent of the Incentive Fee is described as: "Change of Occupancy Downtime." The standard states: "(1) Monthly downtime is less than 75% of allowable downtime and; (2) 90% or more of the units have downtime less than or equal to 3 days".

25. The contracting officer's final decision stated: "There was only one change of occupancy performed. It was performed in a single day." The contracting officer notified Laurelwood that it would receive twenty percent of the Incentive Fee. That amount has not yet been paid to Laurelwood.

26. Ten percent of the Incentive Fee is described as: “Service Calls – a. Emergency”. The standard is stated as: “(1) Average response time is equal to or less than 45 minutes and; (2) All calls have response times equal to or less than 60 minutes”.

27. The contracting officer’s final decision stated: “Reports for 16-31 December, 1-31 January, 1-28 February, 1-31 March were received. There were 5 emergency calls. Laurelwood failed to report actual response times on the summary or individual work orders. No reports were received for Nov, 1-15 Dec, or Apr.”

28. Based on information and belief and consistent with Laurelwood’s standard practice for the past 17 years, Laurelwood did, in fact, respond to all emergency service calls in an average time of less than 45 minutes and all emergency service calls with a response time of less than 60 minutes and thereby earned ten percent of the Incentive Fee.

29. Five percent of the Incentive Fee is described as: “Service Calls – b. Urgent”. The standard is stated as: “(1) Average response time is equal to or less than 3 hours and; (2) 95% or more of the calls had response times less than or equal to 4 hours”.

30. The contracting officer’s final decision stated: “Reports for 16-31 December, 1-31 January, 1-28 February, 1-31 March were received. There were 5 emergency [sic] calls. Laurelwood failed to report actual response times on the summary or individual work orders. No reports were received for Nov, 1-15 Dec, or Apr”.

31. Based on information and belief and consistent with Laurelwood’s standard practice for the past 17 years, Laurelwood did, in fact, respond to all “urgent” service calls in less than 3 hours with 95 percent of the calls having a response time of less than 4 hours and thereby earned five percent of the Incentive Fee.

32. Two percent of the Incentive Fee is described as: "Service Calls – c. Routine". The standard is stated as: "(1) Average completion time equal to or less than 7 days and; (2) 90 % or more of the calls had response times less than or equal to 4 hours.

33. The contracting officer's final decision stated: "Reports for 16-31 December, 1-31 January, 1-28 February, 1-31 March were received. There were 5 emergency [sic] calls. Laurelwood failed to report actual response times on the summary or individual work orders. No reports were received for Nov, 1-15 Dec, or Apr".

34. Based on information and belief and consistent with Laurelwood's standard practice for the past 17 years, Laurelwood did, in fact, complete all routine service calls within 7 days and did respond to all such calls within 4 hours and Laurelwood thereby earned five percent of the incentive fee.

35. Eight percent of the Incentive Fee is described as: "Correction of Deficiencies – (Maintenance and Repair)". The standard is stated as: "(1) Over 75% of the work orders (jobs) were completed within the scheduled time period and; (2) 95% or more of the individual orders were completed in 14 days or less".

36. The contracting officer's final decision stated:

> Structural Exterior Inspection should be conducted twice yearly. A comprehensive report that identifies discrepancies along with scheduled timeframes for completion to monitor performance has not been submitted. Deficiencies noted include the repair of gutters which has consistently shown up on survey reports since 2001.
> Grey buildings are in need of paint. Compressor/pump areas are in need of paint. This survey did note an improvement with the rotted wood on the blue trash can enclosures. However, rotted wood and areas of T-111 still exist throughout the site. Trash can enclosures and front concrete slabs continue to crack throughout the site due to settlement and poor drainage. These problems continue to exist despite notice to Laurelwood of the defects in prior evaluations.
>
> Interior Inspection – requirements within the homes are beginning to show wear. Certain replacements parts are no longer available due to the age of equipment.

> These problems continue to exist despite notice to Laurelwood of the defects in prior evaluations.
>
> Road inspection is due quarterly. No quarterly report on the condition of the roads and subsequent repairs has been submitted for this reporting period. Street sweeping is needed on a consistent basis. These problems continue to exist despite notice to Laurelwood of the defects in prior evaluations.
>
> HVAC – Preventive maintenance on the air conditioning systems is due during this reporting period. QC reports did not indicate that this was accomplished. Heating systems were still being PM'd in November.

37. Based on information and belief and consistent with Laurelwood's standard practice for the past 17 years, Laurelwood did, in fact, complete 75 % of the work orders within the scheduled time period and 95 % of the individual orders were completed in 14 days or less and Laurelwood thereby earned eight percent of the Incentive Fee.

38. Twenty percent of the Incentive Fee is described as: "Service and Repair Work". The standard states: "(1) Less than 5 % of the service/repair work requires rework".

39. The contracting officer's final decision stated:

> Annual Gas Line Compliance certificate is due yearly. Last compliance report received was for 2005.
>
> Water distribution system maintenance is due yearly. No report received for hydrant flushing for 2006.
>
> Pump Station Maintenance Monthly – Monthly maintenance was documented 11/8, 11/25, 12/30, 1/31. Due to the absence of QC reports since February 9, February, March and April could not be evaluated.
>
> Wet Well Quarterly Cleaning – Two cleanings should have occurred during this reporting period. There is no report to support that this was accomplished.

40. Based on information and belief and consistent with Laurelwood's standard practice for the past 17 years, less than five percent of the service/repair work required rework and Laurelwood thereby earned twenty percent of the Incentive Fee.

41. Ten percent of the Incentive Fee is described as: "Grounds Maintenance". The standard states: "(1) Observed Defect Rate ≤ 5%".

42. The contracting officer's final decision stated:

> Fertilizing – Annual – No report has been submitted to support that this was accomplished.
>
> Seeding – No report has been submitted to support that this was accomplished.
>
> Weed Control – Weed control is not required during this reporting period.
>
> Tress (Pruning) – Tree work was noted on Government November reports. Developer did not begin to prune trees until January timeframe.
>
> Leave Collection – Continuous from October – April. Leaf collection has been satisfactory throughout the site.
>
> Drainage areas are to be inspected weekly. The QC reports do not indicate any inspection. Areas have erosion and drainage problems. Drainage areas are not being maintained in a sufficient manner. These problems continue to exist despite notice to Laurelwood of the defects in prior evaluations.

43. Based on information and belief and consistent with Laurelwood's standard practice for the past 17 years, the observed defect rate for "Grounds Maintenance" was less than five percent and Laurelwood thereby earned five percent of the incentive fee.

44. Five percent of the Incentive Fee is described as: "Common Area (Maintenance)". The standard states: "(1) Observed Defect Rate ≤ 5%".

45. The contracting officer's final decision stated:

> Street light inspection is due monthly. Government reports show lights out as follows:
>
> Week ending 11/11/05 – 10 lights out
> Week ending 11/18/05 – still working on lights
> Week ending 1/27/06 – 5 lights not working
> Week ending 2/3-06 – 5 lights not working
>
> Woodchip Trail – This trail should be inspected three times a year. Although the trail is cleaned, it has been allowed to deteriorate and become overgrown. These

> problems continue to exist despite notice to Laurelwood of the defects in prior evaluations.

46. Based on information and belief and consistent with Laurelwood's standard practice for the past 17 years, the observed defect rate for maintenance of the Common Area was less than five percent and Laurelwood thereby earned five percent of the Incentive Fee.

47. Five percent of the Incentive Fee is described as: "Common Area (Janitorial)". The standard states: "(1) Observed Defect Rate $\leq$ 5%."

48. The contracting officer's final decision stated:

> Common area janitorial is not performed in accordance with the lease. Many items that are required on a daily, weekly, monthly or yearly basis are not performed consistently. There is no schedule available for any of these requirements. None of this effort appears on the QC report. These problems continue to exist despite notice to Laurelwood of the defects in prior evaluations.

49. Based on information and belief and consistent with Laurelwood's standard practice for the past 17 years, the observed defect rate for janitorial requirements in the Common areas was less than five percent and Laurelwood therefore earned five percent of the Incentive Fee.

50. Five percent of the Incentive Fee is described as: "Q.C. [Quality Control] Program". The standard states: "(1) Over 50% of the defects reported to QAE and substantiated by Q.C. Records".

51. The contracting officer's final decision stated:

> Not all of the established QC reports are being submitted. Monthly QC reports are not being submitted on a consistent basis. In the absence of these reports I have been unable to validate:
>
> Monthly maintenance of the pump stations, Air Conditioning PM's – Seasonal, Yearly Tune-Ups of Pump Station; and Wet Well Cleaning – Qtrly.

52. Based on information and belief and consistent with Laurelwood's standard practice for the past 17 years, over 50 percent of the defects have been reported to QAE and substantiated by Q.C. records and Laurelwood therefore earned five percent of the Incentive Fee.

53. Four percent of the Incentive Fee is described as: "Record Keeping". The standard states: "(1) Observed Defect Rate ≤ 5 %".

54. The contracting officer's final decision stated: "Reports not submitted or submitted lacking information. Detailed timeframes to include the time that service calls were responded to and completed need to be provided in order to evaluate the incentive fee."

55. Based on information and belief and consistent with the standard of practice for Laurelwood for the past 17 years, the observed defect rate for record keeping requirements of the lease was less than four percent and Laurelwood therefore earned four percent of the incentive fee.

56. Two and one-half percent of the Incentive Fee is described as: "Vehicular/Pedestrian". The standard states: "(1) 0 Defects".

57. The contracting officer's final decision stated: "Areas of sidewalk and curbing require attention. No re-striping of road areas/parking areas QC reports do not indicate that any road inspections are being accomplished".

58. Based on information and belief and consistent with the standard practice of Laurelwood for the past 17 years, there were zero defects for vehicular/pedestrian requirements and Laurelwood therefore earned two and one-half percent of the Incentive Fee.

59. Two and one-half percent of the Incentive Fee is described as: "Playground – 2 ½ of the Incentive Fee." The standard states: "(1) 0 defects".

60. The contracting officer's final decision stated:

> Tot lots – Submitted QC reports show areas being cleaned and trash emptied. However, the trash can holders and original benches are in poor condition. Playground mulch is not being roto-tilled on a consistent basis. There is not [sic] way to insure that Laurelwood is doing consistent safety inspections on the playground equipment, no reports or any type of schedules are submitted. These problems continue to exist despite notice to Laurelwood of the defects in prior evaluations.

61. Based on information and belief and consistent with the standard of performance for the past 17 years, Laurelwood had zero defects with regard to the Lease's requirements for the playgrounds and Laurelwood therefore earned two and one-half percent of the incentive fee.

62. Five percent of the Incentive Fee is described as : "Fire Protection." The standard states: "(1) 0 defects".

63. The contracting officer's final decision stated: "The last report for hydrant flushing was received in Oct 05. No report of any repairs or maintenance has been received since Oct 05."

64. Based on information and belief and consistent with Laurelwood's standard of practice for the past 17 years, there were zero defects at Laurelwood with regard to Fire Protection and Laurelwood therefore earned five percent of the Incentive Fee.

**COUNT 1**

65. Plaintiff repeats and realleges the allegations in paragraphs 1 through 64 as if fully stated herein.

66. The unambiguous terms of the Lease, as interpreted by responsible officials of both parties for more than 17 years requires the Navy to compensate Laurelwood for vandalism damage caused by individuals on the Laurelwood property with the exclusive permission of the Navy.

67. Laurelwood properly submitted separate requests for payment for vandalism damage to its property in the total amount of $13,659.50.

68. The Navy initially rejected that request for payment.

69. Laurelwood filed a claim with the Navy's contracting officer for the vandalism damage in the amount of $13,659.50.

70. The Navy's contracting officer initially issued a final decision on that claim and denied it.

71. Pursuant to the terms of the Lease, the Navy is responsible for the vandalism damage in the amount of $13,659.50, plus interest.

72. The Navy has now rescinded the contracting officer's previous decision and paid the full amount of the invoices plus some interest from the date of the claim filed by Laurelwood.

73. The Navy has not paid the Prompt Payment Act interest for the amounts owing thirty days after receipt of the invoices that have now been determined to be proper by the contracting officer.

74. The amount of additional interest owed, including the proper calculation of Contract Disputes Act interest and Prompt Payment Act interest is $149.26.

75. This appeal is timely filed having been filed within 365 days from the date of receipt of the Navy's initial final decision.

**COUNT 2**

76. Plaintiff repeats and realleges the allegations in paragraphs 1 through 75 as if fully stated herein.

77. The unambiguous terms of the Lease provide for a specific calculation of an incentive fee for the time period from November 1, 2005 through April 30, 2006.

78. Laurelwood met the performance standards, as stated in the Lease, of the Incentive Fee for this time period.

79. Except for $3,467.73, the Contracting Officer denied Laurelwood's claim for the Incentive Fee based on factors unrelated to the specific performance standards stated in the Lease.

80. This appeal is timely filed having been filed within 365 days from the date of receipt of the Navy's final decision.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Laurelwood Homes LLC hereby respectfully requests the following relief:

1. That the Court award plaintiff the amount of $149.26 in interest, including payment for Prompt Payment Act interest now owing on the properly submitted vandalism claims.

2. That the Court award plaintiff the amount of full amount of the Incentive Fee of $17,339.00 plus interest for the earned Incentive Fee for the period of November 1, 2005 through April 30, 2006.

3. That the Court award plaintiff the costs of pursuing this claim, including but not limited to attorneys fees; and

4. That the Court provide such other relief as the Court may deem just and proper.

Respectfully submitted,

s/William A. Shook
William A. Shook
Kirkpatrick & Lockhart
Preston Gates Ellis LLP
1735 New York Avenue NW
Suite 500
Washington, D.C. 20006
Telephone 202 661 6256
Facsimile 202 331 1024
Email: bill.shook@klgates.com

Date: April 3, 2007